IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In re Receivership of<br>JDH Investment Group, LLC<br><br>JDH INVESTMENT GROUP, LLC,<br><br>                Respondent,<br><br>    v.<br><br>BRIDGES WEST, LLC,<br><br>                Appellant. | No. 86303-7-I<br>(Consolidated with<br>No. 87257-5-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Bridges West, LLC purchased a promissory note from Sue Jones after JDH Investment Group (JDH) defaulted on the note. Bridges West and JDH disputed the interpretation of the promissory note and extension note. Bridges West appeals the superior court's conclusion that the note's interest rate provision applies only to simple interest, and that the note's late fee provision is unenforceable. We affirm.

FACTS

Sue Jones personally loaned JDH $2 million to purchase undeveloped property in Auburn, Washington. In exchange, on June 11, 2013, JDH signed a promissory note,

titled FIRST STRAIGHT NOTE, secured by a deed of trust to the Auburn property.[1]

Under the terms of the note, JDH promised to pay Jones $2 million with interest from June 14, 2013 until paid, at the rate of 12.00 percent, per annum, due on June 14, 2014. The relevant language of the note also states:

> **LATE CHARGE:** In the event any payment is not paid within 10 days of the due date, Trustor shall pay to Beneficiary a LATE CHARGE of 6.00% of the payment due in addition to each payment due and unpaid.
> …
>
> Should interest not be so paid, it shall thereafter bear like interest as the principal, but such unpaid interest so compounded shall not exceed an amount equal to simple interest on the unpaid principal at the maximum rate permitted by law. Should default be made in the payment of any installment of interest when due, then the whole sum of principal and interest shall become immediately due and payable at the option of the holder of this note.

On the note's due date, June 14, 2014, JDH and Jones executed a PROMISSORY NOTE EXTENSION AGREEMENT. The parties agreed to the following:

1. PRINCIPAL BALANCE. The outstanding principal amount due under the Note is currently Two Million and 00/100 Dollars ($2,000,000.00). In addition, Two Hundred Forty Thousand and 00/10 Dollars ($240,000.00) in interest has accrued and continues to accrue under the terms of the Note.

2. DUE DATE. The Due Date as defined in the Note is hereby extended to June 14, 2015, on which date all principal and interest remaining outstanding shall be paid in full without further notice or demand.

3. INTEREST RATE. Buyer shall pay interest on the outstanding principal and accrued interest to date under the Note, at the rate of (12)% TWELVE percent *per annum*.

4. MISCELLANEOUS. Except as expressly modified herein, all other terms and provisions of the Note shall remain in full force and effect.

---

[1] The note was signed by Jones as manager of JDH at that time. Thomas J. Downie is the sole owner of JDH.

On August 15, 2017, Jones, at the request from JDH, presented a LOAN PAY OFF DEMAND. The demand provided the following breakdown of the amount owed by JDH:

```
ACCRUED INTEREST:
Year 1 June 2013 to June 14, 2014        $240,000.00
Year 2 June 15, 2014 to June 14, 2015    $268,800.00
Year 3 June 15, 2015 to June 14, 2016    $268,800.00
Year 4 June 15, 2016 to June 14, 2017    $268,800.00
Year 5 June 15, 2017 to August 15, 2017  $ 44,922.84
Late Charge of 6% of payment due
(due under extension agreement 6/14/15)  $150,528.00
Principal Due                            $2,000,000.00
```

**Total due on 8-15-17                   $3,241,850.84**

**\*Under Paragraph 3 of the Promissory Note Extension Agreement –** interest is accruing on the outstanding principal balance and accrued interest to date at the rate of 12% per annum. The daily interest is calculated at $736.44 per day.

On August 24, 2018, Jones served JDH with an AMENDED NOTICE OF DEFAULT, which notified JDH that the foreclosure process on the Auburn property had begun. The notice listed the delinquent amounts as of August 23, 2018, under the "Promissory Note and Promissory Note Extension Agreement:"

```
Principal balance (loan matured):               $2,000,000.00
Late charges due under extension agreement       $150,528.00
Interest rate (12%) per annum:                  $1,366,014.36
June 15, 2013-August 23, 2018 (@ 736.44 per day)
TOTAL PRINCIPAL, INTEREST & LATE CHARGES  $3,516,542.36
```

In September 2019, JDH filed a petition for general receivership under RCW 7.60.025(1)(j). JDH asserted that it was unable to pay its debts and that its only asset is the Auburn property valued at approximately $15 million. JDH listed creditors in its filed Assignment for the Benefit of Creditors, which included Jones and the amount of $4

million. A King County Superior Court commissioner granted JDH's petition and appointed a receiver to take control of JDH's assets.

Jones submitted a creditor's claim to the court in December 2019. The claim re-stated the accruing interest rate on its note was 12 percent per annum and that the interest accrued at a rate of $736.44 per day.

In March 2021, Jones sold her note to Bridges West for $3,775,000.00. The Purchase and Sale/Assignment Agreement incorporated the following status of the loan, as of March 15, 2021, as represented by Jones:

6. The Note/Loan is in default and has been since June 14, 2015.
7. The principal Loan Balance was initially $2,000,000 but $240,000 (first year interest) was added under the extension agreement.
8. The Note/Loan accrues interest at 12% per annum.
9. The Note/Loan has a 6% late charge provision which I have asserted.

As successor in interest to Jones, Bridges West then filed an amended secured creditor claim. It asserted the balance owed as of March 15, 2021, was $3,784,248.12, not including late charges, attorney fees or costs incurred. Consistent with the previous claim, it asserted the note/loan accrued interest at the rate of 12 percent per annum.

In August 2023, the court granted the receiver's motion for order authorizing the sale of the Auburn property.

Bridges West filed an updated amended claim in December 2023. This time, Bridges West calculated the amount owed by annually compounding the interest "as provided for by the Extension and the default provision of the Note." Bridges West claimed the total balance owed, as of December 12, 2023, was $7,013,717.[2] JDH

---

[2] Bridges West claimed that the accrued interest between June 14, 2014 and June 14, 2023 to be $4,209,998; and that the accrued interest between June 14, 2023 and December 14, 2023 to be $396,146 ("183 days since June 14, 2023"). The total amount included penalties, attorney fees and costs.

objected to Bridges West obtaining annual compounding interest in lieu of the simple interest on $2,240,000 as provided for in the note. JDH asserted that neither the note nor the extension called for compounding interest. JDH also argued that the 6 percent late fee to the final payment would operate as a penalty and, therefore, is unenforceable.

In January, the court ruled on the objections to Bridges West's claim and held that the promissory note's "interest shall accrue as simple interest at a rate of 12% per annum, consistent with the Extension Agreement and the Purchase and Sale Agreement of the Sue Jones Claim, signed by Bridges West." The court also held that the 6 percent late fee provision was unenforceable.

Bridges West appealed the court's January ruling. JDH filed its response brief in July and argued that the court's order on objections is not appealable as a matter of right under RAP 2.2(a), and that discretionary review is not warranted under RAP 2.3(b). In September, the superior court granted JDH's motion to disburse the remaining funds from the court's registry and close the case. Bridges West filed a second appeal of the court's disbursement order. In November, Bridges West filed a motion in this court to consolidate the two appeals because the substantive issues are the same. JDH filed a response to the motion and took no position as to the motion to consolidate. This court granted the motion to consolidate.

DISCUSSION

Interest Rate

The parties disagree as to the plain reading of the note and the extension agreement. Bridges West contends that the court erred because the plain language of

the note and extension agreement calls for compounding interest after a default. JDH counters that the plain language of the extension establishes that only simple 12 percent interest per annum applies and that neither the note nor the extension agreement allowed for compounded interest. We agree with JDH.

The touchstone of contract interpretation is the parties' intention, which we follow the "objective manifestation theory" of contracts. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "Clear and unambiguous contracts are enforced as written." Grey v. Leach, 158 Wn. App. 837, 850, 244 P.3d 970 (2010) (citing McDonald v. State Farm Fire & Cas. Co., 119 Wn.2d 724, 733-34, 837 P.2d 1000 (1992)). We give "words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." Hearst Commc'ns, Inc., 154 Wn.2d at 504. If relevant to determining mutual intent, we may consider surrounding circumstances and other extrinsic evidence to interpret the meaning of specific words and terms used. However, such evidence may not be used to demonstrate an intention outside the instrument itself, nor to alter, contradict, or modify the written terms. Hollis v. Garwall, Inc., 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999). Contract interpretation is a question of law, which we review de novo. Berg v. Hudesman, 115 Wn.2d 657, 668, 801 P.2d 222 (1990); Keystone Masonry, Inc. v. Garco Constr., Inc., 135 Wn. App. 927, 932, 147 P.3d 610 (2006) (absent disputed facts, the legal effect of a contract is a question of law we review de novo).

In the state of Washington, compound interest is permitted only by explicit language in an agreement or by statute. "To create an obligation to pay compound interest, there must be an agreement to pay interest upon interest;…it is not enough

that the note provides for the annual payment of interest." <u>Goodwin v. Nw. Mut. Life Ins. Co.</u>, 196 Wash. 391, 404, 83 P.2d 231 (1938) (quoting <u>Cullen v. Whitham</u>, 33 Wash. 366, 368, 74 P.581 (1903)).

In the instant case, the parties initially agreed that JDH would pay 12 percent interest on the $2 million principal balance, per annum, starting from June 14, 2013. The note also provided how the interest would be calculated should JDH not pay the interest owed:

> Should interest not be so paid, it shall thereafter bear like interest as the principal, but such unpaid interest so compounded shall not exceed an amount equal to simple interest on the unpaid principal at the maximum rate permitted by law.

The "it" refers to the interest not paid. The paragraph addresses the interest rate to be applied to the unpaid interest and plainly includes the term "compounded." When the parties executed the extension agreement on the due date of the original note, they agreed that the interest that had accrued at that point was $240,000 under the terms of the note. It then defined the "PRINCIPAL BALANCE" under the extension agreement as the outstanding $2 million principal under the note and the $240,000 in accrued interest. The new "DUE DATE" became June 14, 2015. The agreed "INTEREST RATE" was 12 percent per annum applied to the outstanding principal and accrued interest "to date" under the note. That amount was $2,240,000. Applying 12 percent to $2,240,000 equates to $268,800.

Bridges West argues that the "Interest Rate" provision in the extension agreement "simply provided a new interest provision for when JDH wasn't in default." But the interest rate from the original note and in the extension agreement continued to be 12 percent per annum. What changed was the principal balance of which the 12

percent interest rate applied. Instead of $2 million, the "PRINCIPAL BALANCE" became $2,240,000. This was true whether JDH was or was not in default by the new maturity date. The extension agreement could have defined the new principal balance, and not have addressed the interest rate if the parties intended for all the language related to interest on the original note to remain in effect.

Bridges West also argues that the "MISCELLANEOUS" provision in the extension agreement supports an interpretation that the "compounded" interest language in the initial note is still applicable. The "MISCELLANEOUS" provision provides that "[e]xcept as expressly modified herein, all other terms and provisions of the Note shall remain in full force and effect." Bridges West argues that nothing in the extension agreement supplanted the note's interest rate default provision, and that the extension agreement provides for the interest due by the due date.

First, the applicable interest applies "until paid" and is not limited to application only up to the "due date." Therefore, the suggestion that another provision is necessary to address what the interest would be after the point of default is unpersuasive. Second, the "INTEREST RATE" provision in the extension agreement modifies the application of how interest is applied in the note. The original note's provision discussing "compounded" interest, expresses the application of interest as applied to unpaid interest. Bridges West is correct that the note provided a 12 percent interest rate to the $2 million principal and that the provision discussing "compounded" interest relates to unpaid interest. The parties were free to renegotiate the terms of interest on the loan when it entered into the extension agreement and elect not to include the provision that

compounds interest on unpaid interest. This is consistent with the subsequent conduct of the original parties to the contract.

JDH contends that the trial court's decision to deny Bridges West's claim for compound interest is consistent with the parties' intent and course of dealing. We agree.

A court's purpose in interpreting a written contract is to ascertain the parties' intent. U.S. Life Credit Life Ins. Co. v. Williams, 129 Wn.2d 565, 569, 919 P.2d 594 (1996). To facilitate in determining the contracting parties' intent, the Court adopted the "context rule" in Berg, 115 Wn.2d at 667. Under the context rule, extrinsic evidence is admissible to assist the court in ascertaining the parties' intent and in interpreting the contract. U.S. Life Credit, 129 Wn.2d at 569. The court may consider (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7) the course of dealing between the parties. Berg, 115 Wn.2d at 666-68. Such evidence is admissible regardless of whether the contract language is deemed ambiguous. Id. at 668. Extrinsic evidence cannot be considered: (a) to show a party's unilateral or subjective intent as to the meaning of a contract word or term; (b) to show an intention independent of the instrument; or (c) to vary, contradict, or modify the written word. Hollis, 137 Wn.2d at 695. "Extrinsic evidence is to be used to illuminate what was written, not what was intended to be written." Id. at 697.

JDH's reliance on extrinsic evidence to show how Jones' course of dealing with JDH, along with the parties' subsequent conduct, demonstrates the parties' intent and

supports the trial court's interpretation of the contracts. Jones, at JDH's request, presented a loan pay off demand on August 15, 2017. In the demand, Jones listed the accrued interest from June 2013 through August 15, 2017. After June 14, 2014, the annual accrued interest was $268,800 each full year, which is 12 percent of $2,240,000. Jones also expressly referenced the interest rate from the extension agreement and stated the daily interest is calculated at $736.44 per day. On August 24, 2018, Jones served JDH an amended notice of default with an updated outstanding balance as of August 23, 2018, and still described the daily interest as $736.44. When Jones sold her note to Bridges West in March 2021, Jones represented that "[t]he principal Loan Balance was initially $2,000,000 but $240,000 (first year interest) was added under the extension agreement," and "[t]he Note/Loan accrues interest at 12% per annum." The amounts Jones stated in her demands, claims and representations were consistent with the application of simple 12 percent interest on $2,240,000, as stated in the extension agreement. Jones never mentioned compounding unpaid interest.

Given that Jones was in the position of trying to collect on her unpaid debt, she would have been motivated to claim a higher amount if the note supported it. JDH's interpretation of the contracts is reasonable. The extrinsic evidence illuminates the plain language of the contracts and supports the trial court's ruling that rejected the application of compounding interest on unpaid interest.

Therefore, we agree that the plain language of the extension agreement supports the trial court's ruling that interest shall accrue as simple interest at a rate of 12 percent per annum, consistent with the extension agreement and the purchase and sale agreement signed by Bridges West.

<u>Late Fee</u>

Bridges West argues that the trial court incorrectly denied them the 6 percent late fee on the promissory note by concluding that it was a penalty.

The late fee provision provides: "In the event any payment is not paid within 10 days of the due date, Trustor shall pay to Beneficiary a LATE CHARGE of 6.00% of the payment due in addition to each payment due and unpaid." The trial court agreed with JDH that the late fee amounted to a penalty and was unenforceable. The trial court did not err.

Questions of contract interpretation are a question of law we review de novo. <u>Dave Johnson Ins. v. Wright</u>, 167 Wn. App. 758, 769, 275 P.3d 339 (2012). We review the trial court's receivership rulings that order turnover, disallow claims, and enter judgment, for an abuse of discretion. <u>Matter of Applied Restoration, Inc.</u>, 28 Wn. App. 2d 881, 891, 539 P.3d 837 (2023). An abuse occurs when a decision is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" <u>Mony Life Ins. Co. v. Cissne Family L.L.C.</u>, 135 Wn. App. 948, 952-53, 148 P.3d 1065 (2006) (quoting <u>T.S. v. Boy Scouts of Am.</u>, 157 Wn.2d 416, 423, 138 P.3d 1053 (2006)).

Washington courts generally uphold liquidated damages provisions unless it is considered a penalty or determined to be unlawful. <u>Wallace Real Estate Inv., Inc. v. Groves</u>, 124 Wn.2d 881, 886, 881 P.2d 1010 (1994). Actual damages need not be proven by the party asserting a right to the liquidated damages. <u>Id.</u> at 892. Under Washington's two-part liquidated damages test, first, the "amount fixed [as liquidated damages] must be a reasonable forecast of just compensation for the harm that is caused by the breach." <u>Walter Implement, Inc. v. Focht</u>, 107 Wn.2d 553, 559, 730 P.2d

1340 (1987). Secondly, "the harm must be such that it is incapable or very difficult of ascertainment." Id. "[L]iquidated damages agreements fairly and understandingly entered into by experienced, equal parties with a view to just compensation for the anticipated loss should be enforced." Wallace, 124 Wn.2d at 886. "Determination of whether the test is met depends upon the facts and circumstances of each case." Walter Implement, 107 Wn.2d at 559.

Bridges West contends that the late fee charge at issue meets the two-part liquidated damages test. First, Bridges West asserts that the 6 percent late charge was an effort to compensate Jones for her losses in the case of a default by JDH. Moreover, Bridges West claims that the 6 percent fee represents the collection risk that Jones would face during a time when the real estate market was still vulnerable due to the great recession. Bridges West also argues that the late fee would compensate Jones for the potential loss on other investment opportunities. However, Bridges West's argument fails for two reasons.

First, in line with Wallace, our court must determine whether the liquidated amount acts as a reasonable pre-estimate loss. 124 Wn.2d at 894-97. Here, Bridges West fails to cite to any evidence to support that the parties involved had intended for the 6 percent late charge to constitute a legitimate estimate of Jones's/Bridges West's actual damages that would be incurred upon default.

Additionally, Bridges West's argument as to how it has met the two-prong Walter Implement test is raised for the first time on appeal, resulting in a post-hoc rationalization to ensure enforcement of the late charge provision. "Courts will look to

the intention of the parties to make an accurate assessment of the clause's purpose." Walter Implement, 107 Wn.2d at 559.

Without such evidence, the late fee provision cannot be justified as a reasonable forecast of loss. Since Bridges West has not established that the 6 percent late fee is a fair estimate of damages suffered, the provision appears punitive as opposed to compensatory. As a result, under the principles of Walter Implement, we find that the lower court did not abuse its discretion, affirming its determination that the late fee provision is unenforceable because it is a penalty.

### Attorney Fees on Appeal

Both parties request attorney fees under the attorney fee provision in the original note.

"A party is entitled to attorney fees on appeal if a contract, statute, or recognized ground of equity permits recovery of attorney fees at trial and the party is the substantially prevailing party." Hwang v. McMahill, 103 Wn. App. 945, 954, 15 P.3d 172 (2000). The original note provides that "[s]hould suit be commenced to collect this note or any portion thereof, such sum as the Court may deem reasonable shall be added hereto as attorney's fees." Though JDH did not commence suit to collect on this note, under RCW 4.84.330, the prevailing party, whether they are the party specified in the contract or not, shall be entitled to reasonable attorney fees in addition to costs and necessary disbursements.

Because we affirm as to both issues, JDH is the prevailing party, and is thereby entitled to attorney fees on appeal.[3]

We affirm.

_Coburn, J._

WE CONCUR:

_Díaz, J._                          _Smith, J._

---

[3] Because we affirm, we need not consider Bridges West additional claim that the trial court's disbursement of $2.3 million to JDH should be reversed, an issue Bridges West raises for the first time in its reply brief. A court will not review an issue raised and argued for the first time in a reply brief. In re Pers. Restraint of Rhem, 188 Wn.2d 321, 327, 394 P.3d 367 (2017); RAP 10.3(c).